IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **MINDI HARRIS,**   ) | |
| ) | |
|    **Plaintiff**   ) | |
| ) | |
| **v.**   ) | **CIVIL ACTION NO.** |
| ) | **2:14-CV-2172-KOB** |
| ) | |
| **CAROLYN W. COLVIN,**   ) | |
| **Acting Commissioner**   ) | |
| **Social Security Administration,**   ) | |
| ) | |
|    **Defendant**   ) | |

# MEMORANDUM OPINION

## I. INTRODUCTION

On April 28, 2012, the claimant, Mindi Harris, filed a Title II application for disability insurance benefits and Title XVI application for supplemental security income. (R. 107-08). Each claim alleged disability beginning on March 13, 2012 because of posttraumatic stress disorder, depression, anxiety, migraines, irritable bowel syndrome, and arthritis. (R. 227). The Commissioner denied the claims on August 6, 2012 on the basis that she was capable of performing certain types of work. (R. 107-08, 112-13).

The claimant timely requested a hearing before an ALJ on September 13, 2012. (R. 119-20). ALJ George Merchant held a hearing on November 20, 2013. (R. 39). The ALJ denied the claimant's application in a letter dated January 13, 2014, (R. 16), finding that the claimant was not disabled, even if she stopped her substance use. (R. 32). The claimant filed a request for review by the Appeals Council on January 13, 2014, and the Appeals Council denied that request

on September 8, 2014. (R. 7). Having exhausted her administrative remedies, the claimant now appeals the ALJ's decision, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The claimant filed this appeal on November 10, 2014. (Doc. 1). For the reasons stated below, this court reverses and remands the decision of the Commissioner because substantial evidence does not support the ALJ's RFC finding regarding absences from work.

## II. ISSUE PRESENTED

The claimant presents the following issue for review: whether substantial evidence does not support the ALJ's RFC finding that, if the claimant were not using illegal substances, she would not have excessive absences from work and could work.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if substantial evidence supports her factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir.1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions...but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months..." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential

3

evaluation process:

>   (1) Is the person presently unemployed?
>   (2) Is the person's impairment severe?
>   (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
>   (4) Is the person unable to perform his or her former occupation?
>   (5) Is the person unable to perform any other work within the economy?
>
>   An affirmative answer to any of the above questions leads either to the next question or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R.§§ 404.1520, 416.920.

The Social Security Act precludes the award of benefits when drug or alcohol abuse is a contributing factor material to the finding of disability. *See* 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. §§ 404.1535, 416.935. If a claimant is found disabled and medical evidence of substance abuse exists, the ALJ must determine whether the abuse is "a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(a), 416.935(a).   The ALJ must evaluate which of the claimant's physical and mental limitations would remain if she stopped using drugs or alcohol and then decide whether any of those remaining limitations would be disabling. *See* 20 C.F.R. § 404.1535(b)(2); *see also Deters v. Comm'r of Soc. Sec.*, 301 F. App'x 886, 888 (11th Cir. 2008). "[I]n disability determinations for which the medical record indicates alcohol or drug abuse, the claimant bears the burden of proving that the substance abuse is not a contributing factor material to the disability determination." *Doughty v. Apfel*, 245 F.3d 1274, 1281 (11th Cir. 2001).

Even if some evidence does not support the Commissioner's factual findings, the court must affirm if substantial evidence supports the ALJ's decision. *Martin v. Sullivan*, 894 F.2d

1520, 1529 (11th Cir. 1990). The claimant has a duty to prove her own case and provide evidence in support of her disability claim. "[T]he claimant bears the burden of proving that [s]he is disabled, and, consequently, [s]he is responsible for producing evidence in support of h[er] claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003)

## V. FACTS

The claimant was thirty-four years old at the time of the decision, (R. 39, 81), and has earned her GED (R. 295). She has no past relevant work, (R. 26), and alleges disability beginning on March 13, 2012, resulting from posttraumatic stress disorder, depression, anxiety, migraines, irritable bowel syndrome, and arthritis. (R. 227).

*Physical Limitations*

On July 23, 2012, the claimant saw Dr. Antonio Rozier at the request of the Social Security Administration for a physical evaluation. Dr. Rozier considered the claimant's complaints of hand problems, left ankle pain, and knee pain. He noted that she was independent for all of her personal needs and that she was capable of vacuuming and cleaning dishes. Dr. Rozier diagnosed the claimant with carpal tunnel syndrome, wrist arthritis, arthritis of the left ankle, bilateral arthritis of the knees, and patellofemoral syndrome[1]. He did not note any functional limitations. (R. 391-95).

*Mental Limitations*

On August 30, 2011, the claimant saw Dr. Constance Kemph at the Jefferson County Department of Health for a yearly counseling appointment. The medical record from this visit

---

[1] Patellofemoral syndrome is pain in the front of the knee sometimes caused by wearing down, roughening, or softening of the cartilage under the kneecap.

indicates that the claimant was not suicidal, but that she did have an anxiety disorder. (R. 343-44).

On November 20, 2011, the claimant saw Karen Cropsey, Psy.D. at UAB for a psychological evaluation following a referral from Drug Court. This evaluation indicated that the claimant met the criteria for "Generalized Anxiety Disorder and Major Depressive Disorder, Recurrent, Mild severity." Dr. Cropsey recommended that the claimant continue treatment for substance abuse and consider treatment for other symptoms. (R. 295-99). At a follow-up appointment with Dr. Charles Brendan Clark on January 26, 2012, the claimant reported similar symptoms in addition to problems managing her anger. Dr. Clark amended Dr. Cropsey's report to add "[p]rovide anger management" to Dr. Cropsey's recommendations. Additionally, Dr. Clark noted that the claimant reported that "her boss is becoming angry that she is missing so much time for drug tests and having to go to court." (R. 300-01).

On May 1, 2012, the claimant went to the emergency room at UAB for a psychiatric evaluation. She reported feeling homicidal, with no specific target, and angry. An emergency room physician referred the claimant to psychiatry, where Dr. David Pigott diagnosed the claimant with "[s]uicidality"[2] and "[d]epression." Dr. Pigott prescribed Celexa for her depression. He described the claimant as "stable" and discharged her to the care of her boyfriend. (R. 306-07).

On July 14, 2012, the claimant saw Sally A Gordon, Psy.D. at the request of the Social Security Administration for a mental evaluation. During this evaluation, the claimant said that

---

[2] However, the notes from that visit indicate that the claimant had "no suicidal ideation." (R. 306).

she had been molested as a child by her preacher and that she was traumatized by the deaths of her brother, who was beaten to death by a gang, and stepfather, who committed suicide. She also explained her history of substance use, including marijuana, whiskey, heroin, crack, cocaine, and Dilaudid, but stated that she "has remained consistently abstinent from drugs for the past four years." (R. 384).

The claimant acknowledged feelings of worthlessness and a decreased tolerance for frustration, but she denied suicidal and homicidal thoughts. She also reported "unusual perceptions," such as hearing the radio while it was turned off or saying things aloud that she believed she was thinking. Dr. Gordon concluded that the claimant's "social demeanor and mood will likely be unpredictable" and that she could be overwhelmed by social interaction. She also noted that the claimant was likely to have "significant difficulty responding adaptively to social and work pressures." Ultimately, Dr. Gordon diagnosed the claimant with depressive disorder, anxiety disorder, panic disorder without agoraphobia, posttraumatic stress disorder, pain disorder associated with a general medication condition, alcohol abuse in sustained partial remission, and polysubstance abuse in sustained full remission. (R. 384-86).

On July 17, 2012, Dr. Larry H. Dennis considered the medical records of the claimant at the request of the Social Security Administration. Dr. Dennis noted that the claimant should be able to learn, remember, and complete work instruction, but that her concentration, attention to detail, and short-term memory are likely to be poor because of interference from medical and psychological issues. Dr. Dennis found that the claimant had moderate restrictions of activities of daily living; marked difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace. Additionally, he noted that the claimant had

experienced no episodes of decompensation. (R. 80-86). When considering whether the claimant had the ability to complete a normal workweek without interruptions from psychologically based symptoms, Dr. Dennis noted that the claimant was moderately limited. Ultimately, Dr. Dennis opined that the claimant was not disabled. (R. 93).

On April 24, 2013, Dr. Simon McClure admitted the claimant into St. Vincent's East Hospital because of her complaints of worsening depression, auditory hallucinations, suicidal and homicidal thoughts, and noncompliance with psychotropic medications. Dr. McClure noted the claimant's past noncompliance with medication and that, at the time of her admission, she had been off of her medication for a few months. During her hospital visit, Dr. McClure noted a "rapid and meaningful improvement in her overall condition." Dr. McClure gave the claimant one month's supply of medication for her depression and instructed her to follow up with a doctor so she could continue taking the medication. Dr. McClure released the claimant on April 26, 2013. (R. 409).

On September 8, 2013, Dr. Timothy Blake admitted the claimant into UAB Hospital because of her complaints of suicidal thoughts. She had no other medical complaints. The claimant tested positive for marijuana and benzodiazepine[3]. Dr. Blake referred the claimant to a psychiatric service, and he discharged her the following day. (R. 427-31)

As a result of her visit with Dr. Blake, the claimant went to Eastside Mental Health Center on October 14, 2013 for an appointment with Darlene Davis, M.S. During this appointment, the claimant reported that she had stepped in front of a train, but that the train had

---

[3] The record is unclear if the positive result of benzodiazepine was because of her prescription for Dilaudid.

stopped before hitting her. Ms. Davis implied that this story was not credible, noting that she did not "question the veracity" of the statement, but stated that the claimant had "no insight" into her own situation. Ms. Davis also noted the claimant's history of noncompliance with her medication. (R. 432-38).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability benefits, the claimant requested and received a hearing before an ALJ on November 20, 2013. (R. 41). She began the hearing by answering questions from her attorney. The claimant testified that she last worked at ABC Auto Parts in March 2012 and that she had a good relationship with her boss. However, she added that she often had to miss work, but that her boss was allowing her to do so. The claimant testified that her "main problem[s]" were her anxiety attacks and forgetfulness, and that she could no longer work an eight-hour day. She testified that she had been fired from several jobs previously for missing days at work and being sick. (R. 44-45).

The claimant testified that she had problems with auditory hallucinations, including hearing voices that told her she was worthless. She also said that she was having panic attacks at least once a day, and that they are worse when she went out in public. She testified that she did not drive because she lost her driver's license following a car accident, and that she had been clean from alcohol and drugs for about five years. She also said that she was taking medications for her mental problems and testified that she had run in front of train in July 2013 in an attempt to commit suicide. (R. 46-47).

The claimant said that she had been diagnosed with posttraumatic stress disorder, and explained that she witnessed her stepfather's suicide and she felt the suicide was her fault. She

9

also testified that a doctor diagnosed her with rheumatoid arthritis when she was a child; a doctor later diagnosed her with osteoarthritis; she had trouble with swelling in her left knee and left ankle; and she had trouble picking up things at her last job. She also testified that she sometimes had trouble getting dressed, bending over, getting out of the bath tub, and that she often times stayed in bed all day. She said that generally her pain on a scale from zero-to-ten was a five or a six, although it was occasionally a seven or eight during the night. She testified that she was capable of cleaning up her house, but that she had to take a break every ten to twenty minutes. (R. 48-51). Additionally, she testified that she could not lift anything heavy and could only lift "[a] glass of tea because [she could not] even hardly hold the tea pitcher." (R. 54).

The claimant stated that she was working with a psychiatrist to try to get better because she was "borderline being put back in the hospital" at the time of the hearing. She testified that she went to the hospital twice over the last year, once for three days and once for several hours. She said she felt like one of these episodes was "coming on again." (R. 53).

The ALJ then began to question the claimant about her history of mental illness and substance use. The claimant testified that she graduated from a drug treatment program in 2012 after her arrest for possession of Xanax without a prescription. As a part of this program, she stated that she attended classes three days a week. The ALJ pointed out that the claimant had earlier said she had been clean for five years, but that her hospital records indicated that she tested positive for marijuana and benzodiazepine just months before the hearing. The claimant responded that she used those drugs to help her pain and anxiety, and that she had taken no other drugs since her treatment program. (R. 55-57).

The ALJ then asked the claimant about her physical ailments. She testified that her right

hand and left knee hurt and that she had no medicine prescribed for her pain, but she took Aleve two to four times a day. The claimant testified that this medication helped "a little bit," but that she often woke up in pain in the middle of the night. (R. 57-59). She also said that she occasionally used a combination of hot water and Ace bandages to wrap her hands to prevent swelling. (R. 63-64).

Next, the ALJ asked the claimant about her hobbies and activities of daily living. She testified that she spent three to four hours each day with one of her neighbors watching television, and that she used to sew but was no longer able to because of the problems she had with her hands. The ALJ asked about her earlier statement that she could not lift more than a glass of tea. The claimant testified that at her previous job, she would lift as much as 25 pounds, but that now when she tried to lift things, she dropped them. The claimant stated that she owned two dogs, one of which is very large, but only fed them two cups of food at a time because she could not lift the whole bag of food. She also testified that she had a 15-year-old son who lived with her parents, and she saw him about two hours per week. She stated that she did not attend any after school activities, if he had any. (R. 60-63).

A vocational expert, Ms. Norma Strickland, testified concerning the type and availability of jobs the claimant could perform. The ALJ asked Ms. Strickland to assume a hypothetical individual with the claimant's age, education, and work experience who is capable of medium work; can operate foot controls on the left side no more than occasionally; can never climb ladders, ropes or scaffolds; should avoid exposure to hazardous, moving machinery and unprotected heights; can no more than frequently climb ramps and stairs, balance, stoop, kneel, and crouch; can no more than occasionally crawl; can understand, remember, and carry out no

more than simple instructions for two hour periods with normal breaks to complete an eight-hour day; requires a low stress setting, which is defined as no more than occasional decision making and infrequent changes; can have no more than occasional interaction with the general public, coworkers, and supervisors; and can have no tandem tasks required to carry out the job duties. Ms. Strickland testified that an individual with these restrictions could work as a dry cleaning attendant (500 jobs in Alabama, 27,000 nationally), cleaner (5000 jobs in Alabama, 300,000 nationally), or hand packager (300 jobs in Alabama, 16,000 nationally), all of which exist in significant numbers in Alabama and the national economy. (R. 65).

Next, the ALJ asked about a similar hypothetical individual whose exertional level was reduced to light. Ms. Strickland testified that such an individual could work as a storage facility rental clerk (500 jobs in Alabama, 50,000 nationally), stock checker (150 jobs in Alabama, 13,000 nationally), or produce weigher, (100 jobs in Alabama, 11,000 nationally), all of which exist in significant numbers in Alabama and the national economy. (R. 66).

Ms. Strickland testified that breaks during a workday should typically not exceed 12 to 15 percent of the day, and that, if an individual took breaks in excess of ten minutes per hour, no jobs would be available. She also stated that, in an unskilled job, an individual can miss no more than two days per month, and missing three or more days per month would eliminate all available jobs. (R. 66-67). Ms. Strickland testified that she based her knowledge on her education, experience, and the "very limited research that is available concerning particularly absences." (R. 66-69).

*The ALJ's Decision*

On January 13, 2014, the ALJ issued a decision finding that the claimant was not disabled

under the Social Security Act from March 13, 2012, through the date of the decision. (R. 32). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through September 30, 2013 and had not engaged in substantial gainful activity since March 13, 2012. (R. 21-22).

Next, the ALJ found that the claimant had the severe impairments of arthritis of the left ankle, bilateral knees, and right wrist; carpal tunnel syndrome; patellofemoral syndrome; depression; generalized anxiety disorder; panic disorder; posttraumatic stress disorder (PTSD); and polysubstance abuse and dependence. He found these impairments to be severe because the evidence indicated that they caused more than minimal functional limitations on the claimant's ability to perform work-related duties on a sustained basis and they had persisted for more than twelve months. The ALJ found the claimant's other impairments of irritable bowel syndrome, gastroesophageal reflux disease, migraine headaches, hepatitis C, and juvenile arthritis to be nonsevere because they did not require treatment. (R. 22-23).

The ALJ then determined that the claimant did not have an impairment or a combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered Listings 1.02, 12.04, 12.06, 12.09, and 14.09. Specifically regarding 12.04, 12.06, and 12.09, the ALJ considered the "paragraph B" and "paragraph C" criteria. Applying the test for "paragraph B" criteria, he found that the claimant had moderate restriction of her activities of daily living, moderate difficulties in social functioning, and marked difficulties in concentration, persistence, or pace. Additionally, he noted that she had experienced no episodes of decompensation. Therefore, the ALJ found that the claimant did not satisfy the "paragraph B" criteria. (R. 23-24).

Similarly, the ALJ found that the claimant's condition did not satisfy the "paragraph C" criteria because he found that the claimant's impairments did not cause any of the limitations set forth in Part C, including periods of decompensation, a duration of two years, and a sensitivity to changes in circumstances such that a change would cause an episode of decompensation. (R. 24).

Next, the ALJ found that, based on all of her impairments, including the substance use disorders, the claimant had the residual functional capacity (RFC) to perform medium work, with the limitations that the claimant can operate foot controls on the left side no more than occasionally; can never climb ladders, ropes or scaffolds; should avoid exposure to hazardous, moving machinery and unprotected heights; can no more than frequently climb ramps and stairs, balance, stoop, kneel, and crouch; can no more than occasionally crawl; can understand, remember, and carry out no more than simple instructions for two hour periods with normal breaks to complete a eight-hour day; requires a low stress setting, which is defined as no more than occasional decision making and infrequent changes; can have no more than occasional interaction with the general public, coworkers, and supervisors; can have no tandem tasks required to carry out the job duties; and can be expected to miss work, on average, three or more times a month. To come to this conclusion, the ALJ considered the claimant's noncompliance with medication, her use of illegal drugs when she claimed she was clean, and the medical opinion evidence of Dr. Gordon, Dr. Dennis, and Dr. Rozier. The ALJ noted that he found the opinion of Dr. Gordon to carry partial weight because the claimant was abusing substances at the time, and he found the opinion of Dr. Dennis to be of little weight because the claimant was engaging in alcohol and substance abuse at the time. (R. 25-26).

The ALJ then considered the claimant's age, education, work experience, and RFC in

addition to the vocational expert's testimony to determine that no jobs existed in the national economy that the claimant could perform, so a finding of "disabled" was appropriate under this framework. (R. 27).

Next, the ALJ reconsidered the situation as if the claimant stopped her substance abuse. Again, he found that the claimant's condition did not satisfy any listing, as she still would not satisfy the "paragraph B" or "paragraph C" criteria. (R. 28)

The ALJ continued to evaluate the claimant as though she stopped the substance use, and found that her RFC was identical to the claimant's RFC that included her polysubstance abuse, with the exception that it no longer included "The claimant can be expected to miss work, on average, three or more times a month." (R. 25, 29). The ALJ noted that this finding was supported by the medical record, as well as the opinions of Dr. Dennis and Dr. Cropsey. He added that "nothing in the record" supported a finding that the claimant could not do work at the medium level of exertion with the previous exceptions outlined above. (R. 31).

Finally, the ALJ found that if the claimant stopped her substance use, she would be able to work in several jobs that existed in significant numbers in Alabama and the national economy: dry cleaning assistant (500 jobs in Alabama, 27,000 nationally), cleaner (5000 jobs in Alabama, 300,000 nationally), or hand packager (300 jobs in Alabama, 16,000 nationally). Therefore, the ALJ concluded that a finding of "not disabled" was appropriate. (R. 31-32).

## VI. DISCUSSION

The claimant argues that the ALJ's RFC finding is not supported by substantial evidence. Specially, she claims that the ALJ's conclusion that her excessive absences are attributable solely to her substance use is "speculative and unexplained." (Pls.' Br. 16). This court agrees and finds

that substantial evidence does not support the ALJ's finding that the claimant's substance abuse alone would cause her to miss three or more days of work a month.

If medical evidence of substance abuse exists, the ALJ must determine whether the abuse is a contributing factor material to the determination of disability. 20 C.F.R. § 404.1535(a). The claimant bears the burden of proving that the substance abuse is *not* a contributing factor material to the disability determination. *Doughty*, 245 F.3d at 1281.

In the present case, the ALJ found that the claimant's substance abuse was a contributing factor material to her disability determination. He specifically found that, if the claimant stopped using illegal substances, her RFC would no longer include the limitation of having to miss three or more days of work each month.  The ALJ concluded that "[d]ue to the claimant's continued polysubstance abuse, the claimant can be expected to miss three or more days of work a month on average." (R. 26). However, the ALJ failed to articulate exactly how he came to this conclusion, only stating that the RFC assessment "is supported by the objective evidence of record and the opinions" of Dr. Dennis and Dr. Cropsey. (R. 31).  After a thorough review of the record, the court finds that  substantial evidence does not support his finding that the claimant's absences can be attributed solely to her substance use.

The court finds that substantial evidence in the record does not support the ALJ correlation between the claimant missing three or more days of work a month and an active, ongoing substance abuse problem.  Dr. Gordon indicated that the claimant's polysubstance abuse was in "sustained full remission" in July 2012.  The ALJ did note several positive tests for marijuana and benzodiazepines during emergency room visits in 2011 and 2013; however these few positive tests alone do not constitute substantial evidence to support the ALJ's finding that

her substance abuse would cause her to miss three or more days of work a month. Such a jump, without more, is too speculative, especially considering the numerous other physical and mental impairments in the record that *could* cause the claimant to miss several days of work a month.

Moreover, the fact that during Dr. Clark's evaluation of the claimant in 2012 she reported that "her boss is becoming angry that she is missing so much time for drug tests and having to go to court" does not show that substance abuse caused her to miss three or more days of work each month. Undergoing drug tests could be a requirement of probation for drug court. Having to undergo drug tests does not necessarily correlate to having to miss work because of active substance abuse. (R. 300). This evidence of missing work for drug tests is not inconsistent with the claimant's testimony at the hearing that her employer was allowing her to miss work for those tests and that her "main problem[s]" at work were her anxiety and forgetfulness.

The court finds that substantial evidence in the record does not support the ALJ's finding that the claimant's substance abuse would cause her to miss three or more days of week a month. The ALJ's conclusory finding regarding her missing three or more days of work because of her substance abuse, with no real explanation as to how he came to that conclusion, is unsupported by substantial evidence, and this court cannot affirm an RFC assessment based on such conjecture.

## VII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence does not support the Commissioner's decision. Accordingly, this court REVERSES and REMANDS the decision of the Commissioner with specific instructions for the ALJ to consider and specifically address the evidence upon which he basis his finding that the claimant's substance abuse would

cause her to miss three or more days of work a month.

The court will enter a separate Order in conformity with this Memorandum Opinion.

DONE and ORDERED this 22nd day of March, 2016.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE